UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VALLEY FORGE INSURANCE
COMPANY, et al.,

                    Plaintiffs,

          v.

WASHINGTON SQUARE HOTEL
HOLDINGS, LLC,

                    Defendant.

CASE NO. C21-0847JLR

ORDER

## I.    INTRODUCTION

Before the court is Plaintiffs Valley Forge Insurance Company ("Valley Forge") and Continental Casualty Company's ("Continental") (collectively, "Plaintiffs") motion for summary judgment.  (Mot. (Dkt. # 15); Reply (Dkt. # 21).)  Defendant Washington Square Hotel Holdings, LLC ("WSHH") opposes the motion and asks the court to continue this matter under Federal Rule of Civil Procedure 56(d).  (Resp. (Dkt. # 19) at 9-10.)  The court has considered the parties' submissions, the relevant portions of the

1  record, and the applicable law.  Being fully advised,[1] the court DENIES WSHH's motion

2  for a continuance under Federal Rule of Civil Procedure 56(d) and GRANTS Plaintiffs'

3  motion for summary judgment.

4  ## II.    BACKGROUND

5          This declaratory judgment action arises out of the construction of a Hilton Garden

6  Inn hotel in Bellevue, Washington that began in 2015 (the "Project").  (*See* Compl. (Dkt.

7  # 2) ¶¶ 4.2-4.4; Answer (Dkt. # 10) ¶¶ 4.2-4.4.)  WSHH, the owner of the Project, seeks

8  to recover losses allegedly caused by its former general contractor, Vandervert

9  Construction, Inc. ("Vandervert"), under two policies issued by Plaintiffs to Vandervert:

10  (1) a primary commercial general liability policy issued by Valley Forge (the "CGL

11  Policy"); and (2) an umbrella policy issued by Continental (the "Umbrella Policy")

12  (collectively, the "Policies").  (*See* Compl. ¶¶ 4.2-4.4, 6.3-6.5; Answer ¶¶ 4.2-4.4; Bradix

13  Decl. (Dkt. # 17) ¶ 2, Ex. 3 ("CGL Policy"); Bradix Decl. ¶ 3, Ex. 4 ("Umbrella

14  Policy").)

15          On July 15, 2015, WSHH contracted with Vandervert to act as the general

16  contractor of the Project with an expected substantial completion date of January 25,

17  2017 (the "Contract").  (Todaro Decl. (Dkt. # 16) ¶ 2, Ex. 1 at 1, 3; Todaro Decl. ¶ 3, Ex.

18  2.)  Vandervert, in turn, subcontracted with Peter Winberg Construction Inc. ("PWCI")

19  for rough carpentry and framing work on the Project.  (Todaro Decl., Ex. 1 at 34; Todaro

20  //

21  _____

[1] None of the parties request oral argument (*see* Mot. at 1; Resp. at 1), and the court
concludes that oral argument would not be helpful to its disposition of the parties' submissions.
*See* Local Rules W.D. Wash. LCR 7(b)(4).

22

Decl. ¶ 11, Ex. 14 ("Reasonableness Mot.") at 4).)  PWCI began framing work on the

Project on February 18, 2016.  (Reasonableness Mot. at 4.)  On June 2, 2016, a City of

Bellevue inspector determined that PWCI's installation of exterior sheathing was

deficient and required substantial correction.  (*See* Todaro Decl. ¶ 6, Ex. 9 at 3.)  The

following day, Vandervert notified PWCI that, as a consequence of its substandard work,

"water proofing and window installation" work had been halted and the Project was in

danger of missing its substantial completion deadline.  (*Id.* at 2.)

Between June 14, 2016 and July 14, 2016, the Project received numerous

additional failed inspection notices related to PWCI's work.  (*Id.* at 5-11.)  Without

correcting the flaws in its work, PWCI left the Project on or about July 21, 2016.  (*See*

Todaro Decl. ¶ 7, Ex. 10 ¶ 7; Reasonableness Mot. at 5.)  Vandervert replaced PWCI

with JC's General Construction Co. on July 22, 2016.  (Todaro Decl. ¶ 8, Ex. 11.)  On

August 26, 2016, the City of Bellevue inspector found that framing on the Project had

been "covered without inspection and city approved plans," and ordered Vandervert to

cease work on the Project, submit revised plans to the City for review and approval, and

to schedule additional inspections of those plans.  (Todaro Decl. ¶ 9, Ex. 12

(capitalization omitted).)

Although a "watertight vapor barrier roofing membrane" had been installed on the

Project's roof by the August 26, 2016 stop work date, "the remainder of the [Project's]

[r]oofing [s]ystem remained to be installed."  (*See* Todaro Decl. ¶ 10, Ex. 13 at 2

(emphasis omitted).)  Accordingly, the roof was not fully "dried in" and remained

incomplete when more than eleven inches of rain fell on Bellevue in October 2016,

ORDER - 3

including more than five inches between October 13 and 17, 2016.  (*See* Todaro Decl.

¶ 20, Ex. 23 at 1 (daily log reports from October 13 and 14, 2016); *see also* Todaro Decl.,

Ex. 13 at 2; Todaro Decl. ¶ 12, Ex. 15 at WEST001013, WEST001021 (consultant report

describing water damage and noting that, "the roof was not fully sealed during

construction and rain water entered the building" in Fall 2016); Reasonableness Mot. at 6

(describing flooding and resulting damage).)

This rainfall "caused a substantial accumulation of standing water on the roof,"

which overwhelmed the "temporary water pumps" Vandervert had installed (Todaro

Decl., Ex. 13 at 2 (emphasis omitted)), and "flooded the Project, causing damage to"

heating, ventilation, and air conditioning ("HVAC") work, as well as to electrical work

performed by other subcontractors (*see* Reasonableness Mot. at 5-6; *see also* Todaro

Decl., Ex. 15 at WEST001013, WEST001021, WEST001031 (describing damage from

flooding)).  Bellevue also experienced significant winter storms around December 8 and

12, 2016, which resulted in further flooding and water damage to the Project.

(Reasonableness Mot. at 6.)

Vandervert "attempted to repair the damage to the work of its other subcontractors

and recover the Project schedule," but nevertheless "continued to fall behind schedule

and accrue liability under [the Contract]."  (*Id.*)  Vandervert and WSHH thus executed an

addendum to the Contract, which extended the Project's completion date to October 31,

2017, and set the amount of liquidated damages for delay beyond that date to $14,800 per

day.  (*Id.* at 6-7; Todaro Decl. ¶ 4, Ex. 5 §§ 3-4 (addendum).)  Vandervert failed to

//

complete the Project by that deadline and was ultimately terminated by WSHH on February 1, 2018.  (Todaro Decl. ¶ 13, Ex. 16.)

In connection with the Project, WSHH had purchased two builders risk policies from Darwin National Assurance Company and Westchester Fire Insurance Company. (*See* Todaro Decl. ¶ 14, Ex. 17 at 1; *id.* at n.1.)  On January 23, 2017, WSHH notified its insurers that it was seeking coverage under these policies for losses related to repairing the water damage and associated delays in the Project's completion.  (*See id.* at 2.)  On April 27, 2018, WSHH's insurers advised WSHH that they had determined, after conducting a "preliminary coverage analysis," that the builders risk policies did not provide coverage for losses stemming from the water damage repairs or associated Project delays.  (*See id.* at 5-7.)

On February 2, 2018, Vandervert, which had been terminated by WSHH from the Project the day before (Todaro Decl., Ex. 16), entered receivership in Spokane County Superior Court (*see* Todaro Decl. ¶ 15, Ex. 18 (appointing Barry W. Davidson as Receiver)).  WSHH submitted a claim against Vandervert in the receivership proceeding for $7,772,904.32 in damages related to an alleged "Breach of Contract."  (*See* Todaro Decl. ¶ 16, Ex. 19 (the "Claim") at 1.)  The Claim included liquidated damages, damages relating to the amount required to complete the Project, and legal fees.  (*Id.* at 2.)  The Receiver tendered the Claim to Plaintiffs on Vandervert's behalf on April 20 and 24, 2018, respectively, and sought coverage under the Policies.  (Clapham Decl. (Dkt. # 20) ¶ 2, Ex. 1 (tendering Claim under the CGL Policy); Clapham Decl. ¶ 3, Ex. 2 (tendering Claim under the Umbrella Policy).)

1       After receiving Vandervert's tender, Plaintiffs opened a claim investigation and

2 requested documents from the Receiver.  (Bradix Decl. ¶ 4.)  Approximately seventeen

3 months later,[2] Plaintiffs notified Vandervert that it would defend it against WSHH's

4 Claim in the receivership proceeding but would reserve its rights to, among other things,

5 "deny coverage for defense or indemnity"; "have a court determine whether or not

6 [Valley Forge] is (or ever was) obligated to indemnify Vandervert"; and "seek

7 reimbursement from Vandervert" in the event a court determines that Valley Forge "does

8 not owe a duty to defend or indemnify" Vandervert.  (Bradix Decl. ¶ 5, Ex. 7

9 ("Reservation Letter") at 11.)

10       Subsequently, the Receiver and WSHH entered into a settlement agreement

11 pursuant to which Vandervert assigned its rights and potential claims against Plaintiffs to

12 WSHH and stipulated to a $12,995,563.00 judgment in favor of WSHH.  (*See* Todaro

13 Decl. ¶ 17, Ex. 20 ("Settlement Agreement").)  In return, WSHH agreed to pursue the

14 stipulated judgment only against Plaintiffs.  (*See id.*)  Plaintiffs filed this action on June

15 23, 2021 and seek a declaration that WSHH's losses are not covered by the Policies and

16 that Plaintiffs have no obligation to pay WSHH for them.  (Compl. at 12-13.)  A short

17 while later, on August 10, 2021, WSHH filed an action in King County Superior Court

18 seeking an order determining the reasonableness of the Settlement Agreement (the

19 //

20

21      [2] Plaintiffs attribute this delay to the Receiver's difficulty providing them with Claim-related records necessary to complete the coverage investigation.  (Bradix Decl. ¶ 4.)  WSHH, on the other hand, alleges that the delay is evidence of an unlawful claim investigation.  (*See, e.g.*, Answer at 8, 11 (Counterclaim ¶¶ 5-6, 24).)  The legal significance of that delay, if any, is not before the court.

22

ORDER - 6

1   "Reasonableness Action").  (*See* Todaro Decl. ¶ 18, Ex. 21; *see also* Reasonableness

2   Mot.)  The hearing in the Reasonableness Action has not yet been held.  (*See* Resp. at 8

3   (noting that Plaintiffs requested an extension of the hearing scheduled for February 11,

4   2022).)

5                                **III.    ANALYSIS**

6           Plaintiffs move for summary judgment on their declaratory relief cause of action

7   and ask the court to find that WSHH is not entitled to coverage under the CGL Policy.

8   (Mot. at 1.)  WSHH opposes the motion on substantive grounds and also asks the court to

9   deny or continue Plaintiffs' motion under Federal Rule of Civil Procedure 56(d).  (Resp.

10  at 9-10.)  The court first considers WSHH's motion for a continuance before turning to

11  discuss Plaintiffs' motion for summary judgment and WSHH's arguments in response.

12  **A.    WSHH'S Motion for Rule 56(d) Continuance**

13          As part of its response brief, WSHH asks the court to, "at a minimum," continue its

14  consideration of Plaintiffs' motion in order to afford WSHH an opportunity to conduct

15  discovery.  (Resp. at 9.)  Federal Rule of Civil Procedure 56(d)[3] provides that the court

16  may deny or continue a motion for summary judgment and allow time for discovery if the

17  non-moving party "shows by affidavit or declaration that, for specified reasons, it cannot

18  present facts essential to justify its opposition."  Fed. R. Civ. P. 56(d); *see also Anderson*

19

20          [3] Effective December 1, 2010, Rule 56 was amended and the provisions of subdivision (f)
    were moved to subdivision (d), without substantial change.  Fed. R. Civ. P. 56, Notes of

21  Advisory Committee on 2010 amendments ("Subdivision (d) carries forward without substantial
    change the provisions of former subdivision (f).").  Practice under the rule remains essentially
    the same, and courts apply case law that interpreted prior Rule 56(f) to current Rule 56(d).  *See*

22  *e.g.*, *Martinez v. Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014).

1    *v. Liberty Lobby Inc.*, 477 U.S. 242, 250 n.5, 257 (1986).  General statements that more

2    discovery is needed do not suffice, however.  *See, e.g.*, *Hall v. Hawaii*, 791 F.2d 759, 761

3    (9th Cir. 1986) (finding assertion that discovery would "unearth facts that would reveal

4    that there exists a genuine dispute as to material facts" insufficient).  Where the

5    non-moving party makes the requisite showing, "district courts should grant" requests for

6    a continuance to permit discovery "fairly freely."  *Jacobson v. U.S. Dep't of Homeland*

7    *Sec.*, 882 F.3d 878, 883 (9th Cir. 2018) (quoting *Burlington N. Santa Fe R.R. Co. v.*

8    *Assiniboine & Sioux Tribes of Fort Peck Rsrv.*, 323 F.3d 767, 773 (9th Cir. 2003)).

9         Here, the portion of WSHH's response that comprises its Rule 56(d) motion is

10   accompanied by neither affidavit nor declaration.  (*See* Resp. at 9-10 (citing no

11   evidence).)  And while it asserts that the discovery it has yet to take will include "claims

12   file documents relevant to both plaintiffs' affirmative coverage claims and defendant's

13   bad faith counterclaims" (*id.* at 2 n.1), that sort of conclusory assertion does not provide

14   grounds for a continuance under Rule 56(d).  *See Hall*, 791 F.2d at 761.  Moreover, the

15   discovery WSHH desires is meant "to further support its counterclaim," not to elicit facts

16   essential to oppose Plaintiffs' current motion.  (*See* Resp. at 9 (posing questions for

17   discovery).[4])  WSHH will have the opportunity afforded by the Federal Rules of Civil

18   Procedure to discover facts necessary to support its counterclaims, *see generally* Fed. R.

19   Civ. P. 26, but the court need not wait for that process to play out before deciding the

20   //

21         ───────────────

         [4] Despite some of the arguments that WSHH makes (*see* Resp. at 21-22), neither its bad
22   faith counterclaims nor its entitlement to coverage by estoppel are before the court.  The court
     will address the substance of those issues if and when they are properly presented.

1   motion before it, which presents the separate—and purely legal—question of whether

2   coverage exists under the CGL Policy (*see generally* Mot.). *See also Bancroft v. Minn.*

3   *Life Ins. Co.*, 329 F. Supp. 3d 1236, 1258 (W.D. Wash. 2018) ("An insured can prove a

4   claim for bad faith investigation of the insured's claim—as well as a violation of the

5   CPA—regardless of whether the insurer was ultimately correct in determining that

6   coverage did not exist." (citing *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933,

7   937 (Wash. 1998))), *aff'd*, 783 F. App'x 763 (9th Cir. 2019).

8       Because WSHH does not specify how discovery will aid its opposition of the motion

9   currently before the court—and will not suffer prejudice to its counterclaims by having

10  the court determine the coverage issue now—its motion for a continuance under Federal

11  Rule of Civil Procedure 56(d) is DENIED.

12  **B.   Plaintiffs' Motion for Summary Judgment**

13       Plaintiffs ask the court to enter a declaratory judgment finding that no coverage for

14  WSHH's losses exists under the CGL Policy because:  (1) the Claim does not allege the

15  kinds of losses that fall within the scope of coverage; and, even if it did, applicable

16  exclusions bar coverage for losses (2) "occurring during ongoing operations"; (3) "caused

17  by defective property"; (4) "arising out of delay or loss of use of the property"; and

18  (5) arising from "contractual liabilities." (Mot. at 2.)  These are, Plaintiffs contend,

19  precisely the kinds of losses for which WSHH seeks coverage under the CGL Policy.

20  (*Id.*)  In response, WSHH argues that Plaintiffs' motion will not be ripe for adjudication

21  until the underlying Settlement Agreement is deemed reasonable.  (Resp. at 2.)  It also

22  asserts that its counterclaims should be decided first or contemporaneously since they

seek the remedy of coverage by estoppel, which will supersede any coverage finding

based only on the terms of the CGL Policy.  (*Id.*)  WSHH further argues that the motion

should be denied because questions of fact remain regarding losses that would be covered

and because exceptions exist to the policy exclusions on which Plaintiffs rely, which

would permit coverage under the CGL Policy.  (*Id.* at 2-4.)

After describing the legal standard that applies to its consideration of a motion for

summary judgment, the court turns to consider whether Plaintiffs' motion is ripe for

review and, finding that it is, whether WSHH is entitled to coverage under the CGL

Policy.

1.   Summary Judgment Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, either "party may move

for summary judgment, identifying each claim or defense—or the part of each claim or

defense—on which summary judgment is sought."  Fed. R. Civ. P. 56.  Summary

judgment is appropriate if the evidence, when viewed in the light most favorable to the

non-moving party, demonstrates "that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  *Id.*; *see Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at

248.  A fact is "material" if it "might affect the outcome of the suit under the governing

law."  *Id.*

The moving party bears the initial burden of showing that there is no genuine

dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477

U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

2.    Ripeness of Plaintiffs' Motion

WSHH argues that the court should decline to consider Plaintiffs' motion either because (1) the declaratory judgment claim is dependent on an uncertain outcome in the state court settlement approval proceeding and, thus, unripe (Resp. at 10-11); or (2) as a matter of the court's discretion (*see id.* at 11-12 (citing *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942)).

A declaratory judgment action is ripe if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *In re Coleman*, 560 F.3d 1000, 1004-05 (9th Cir. 2009).  A claim is considered unripe for judicial review "if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-581 (1985)).

1    Plaintiffs' declaratory judgment action plainly involves "a substantial controversy,

2    between parties having adverse legal interests, of sufficient immediacy and reality to

3    warrant the issuance of a declaratory judgment." *In re Coleman*, 560 F.3d at 1004-05.

4    And the state court reasonableness proceeding is not a contingent event upon which

5    Plaintiffs' claim or motion depends. *See Texas*, 523 U.S. at 300.  As Plaintiffs note (*see*

6    Reply at 2-4), the state court will either approve the Settlement Agreement as reasonable,

7    or will establish terms that are deemed reasonable.  *See* RCW 4.22.060(2); *see also*

8    *Schmidt v. Cornerstone Invs., Inc.*, 795 P.2d 1143, 1148 (Wash. 1990) (noting that RCW

9    4.22.060 "allows the trial court to reduce the total sum of an injured party's damage

10   award by an amount determined by the trial court rather than by a jury"); *Meadow Valley*

11   *Owners Ass'n v. St. Paul Fire & Marine Ins. Co.*, 156 P.3d 240, 244 (Wash. App. Ct.

12   2007) ("If the court determines the settlement amount is unreasonable under RCW

13   4.22.060(2), the statute requires the court to then determine a reasonable amount.").

14   WSHH and Vandervert have agreed to abide by the judgment of the state court, even if it

15   "determines that a different [settlement] sum is reasonable" (Settlement Agreement

16   § 2(b)), meaning there will remain a need for this court to decide the coverage issue

17   regardless of the result of the state court proceeding.[5]  In light of that, there is no reason

18   for the court to delay ruling on the coverage issue on ripeness grounds.

19

20   _____

    [5] WSHH cites *Philadelphia Indemnity Insurance Co. v. Olympia Early Learning Center*
    in furtherance of its argument that the "motion is not yet ripe for adjudication and should be

21   stayed pending the outcome of the state court Reasonableness [Action]."  (Resp. at 11 n.44.
    (citing *Philadelphia Indem.*, No. C12-5759RBL, 2013 WL 6174480, at *4 (W.D. Wash. Nov. 21,
    2013)).)  Judge Leighton stayed the federal action in that case because the relief the plaintiff-

22   insurer sought through an interpleader claim turned on whether the defendant-insured could

1    WSHH also suggests the court should, as a matter of discretion, refrain from

2   exercising its jurisdiction.  (Resp. at 11-12 (citing *Brillhart*, 316 U.S. at 491).)  *Brillhart*

3   *v. Excess Insurance Co. of America* counsels that district courts may decline to exercise

4   jurisdiction over declaratory judgment actions to "avoid needless determination of state

5   law issues"; to discourage the use of "declaratory actions as a means of forum shopping";

6   and where abstention is necessary to "avoid duplicative litigation," such as where "there

7   are parallel state proceedings involving the same issues and parties pending at the time

8   the federal declaratory action is filed."  *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220,

9   1225 (9th Cir. 1998).

10   Beyond asserting that *Brillhart* abstention applies, WSHH makes no effort to

11   identify which of the *Brillhart* factors, if any, counsel in favor of abstention.  (*See* Resp.

12   at 12.)  Rather, WSHH points out that the parties are focused on the forthcoming

13   Reasonableness Action and speculates that Plaintiffs intended to "ambush" WSHH by

14   filing their motion such that WSHH would be obligated to respond "on the day after the

15   Christmas vacation weekend."  (*Id.* at 13.)  If correct, WSHH's theory provides good

16   reason for Plaintiffs to receive a lump of coal in their stocking next year, but it provides

17   no reason for the court to abstain from exercising its jurisdiction over this matter or this

18   motion, which will neither determine state law issues unnecessarily, facilitate forum

19   *//*

20

21   establish the insurer's bad faith conduct, which was also at issue as an affirmative claim in a
     parallel state court action.  *See id.* at *3-4.  Because the Reasonableness Action does not
22   implicate issues that overlap with Plaintiffs' claim for declaratory judgment on the existence of
     coverage, *Philadelphia Indemnity* is inapposite.  *See id.*

1    shopping, nor—as explained above—duplicate any aspect of the Reasonableness Action.

2    *See Gov't Emps. Ins. Co.*, 133 F.3d at 1225.

3           Accordingly, this matter, and Plaintiffs' summary judgment motion on the

4    coverage issue, is ripe for adjudication and the court will exercise its discretion to do so.

5    For the same reason, and to the extent WSHH's response could be construed as a motion

6    for a stay, the court DENIES that motion.

7           3.    <u>Coverage Under the CGL Policy</u>

8           Plaintiffs argue, as a threshold matter, that summary judgment should be granted

9    in its favor because WSHH cannot show that its losses are covered under the CGL Policy

10   because the only losses identified in WSHH's Claim arise from Vandervert's breach of

11   the Contract, which Plaintiffs contend are not covered under the CGL Policy.  (Mot. at

12   11.)

13          In assessing whether WSHH's losses are plausibly covered by the CGL Policy, the

14   court "considers (1) whether the alleged damages constitute 'property damage,' (2)

15   whether there was an 'occurrence' that gave rise to the property damages, and (3)

16   whether the property damages are barred by specific policy exclusions."  *Big Const., Inc.*

17   *v. Gemini Ins. Co.*, No. C12-5015RJB, 2012 WL 1858723, at *6 (W.D. Wash. May 22,

18   2012) (citing *Dewitt Const. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1133 (9th

19   Cir. 2002)).  Within the meaning of the CGL Policy, an "occurrence" is "an accident,

20   including continuous or repeated exposure to substantially the same general harmful

21   //

22   //

ORDER - 14

1   conditions." (CGL Policy at 23.[6])  "Property damage" is (a) "[p]hysical injury to tangible

2   property, including all resulting loss of use of that property"; or (b) the "[l]oss of use of

3   tangible property that is not physically injured." (*Id.* at 24.)  Thus, to meet the threshold

4   qualification for coverage under the CGL Policy, the insured, or its assignee, must show

5   that the losses relate to an "accidental physical injury to tangible property or loss of use

6   of tangible property." *See Big Const., Inc.*, 2012 WL 1858723, at *7.

7        As WSHH acknowledges, it bears the burden of showing the disputed losses are

8   covered by the CGL Policy. (*See* Resp. at 14); *Churchill v. Factory Mut. Ins. Co.*, 234 F.

9   Supp. 2d 1182, 1187 (W.D. Wash. 2002) (citing *McDonald v. State Farm Fire & Cas.*

10  *Co.*, 837 P.2d 1000, 1003-04 (Wash. 1992)).  It attempts to make that threshold showing

11  of coverage by arguing that:  (1) Plaintiffs have "acknowledged the insuring agreement

12  was satisfied" in its Reservation Letter; and (2) the money it paid "to repair the damaged

13  non-defective work product completed by the HVAC and electrical subcontractors and

14  PWCI," and its "loss-of-use" of the property "while performing these repairs," amounts

15  to "covered damage." (Resp. at 14.)

16        As an initial matter, the Reservation Letter does not concede that the Claim falls

17  within the scope of the insuring agreement.  Rather, it asserts that the CGL Policy does

18  not cover "alleged faulty workmanship . . . when the alleged damage is confined to the

19  building itself," and expressly "fully reserve[d Plaintiffs'] right to deny coverage."

20  //

21

22        [6] The court uses the page numbers appearing in the CM/ECF header when citing to the
    CGL Policy.

1   (Reservation Letter at 7, 11.)  Thus, WSHH cannot rely on any concession by Plaintiffs to

2   meet its burden.

3         WSHH also relies on evidence that, following Vandervert's departure, it hired

4   two-dozen subcontractors to complete the Project.  (*See* Clapham Decl. ¶ 11, Ex. 9

5   ("Nielson Decl."); Nielson Decl. ¶ 13, Ex. 15 (subcontractor agreements); *see also* Claim

6   at 3.)  Plausibly included in the cost of completing the Project is the cost of repairing

7   damages caused by the flooding in October and December 2016.  (*See* Claim at 3.)

8   Those are losses plausibly caused by "accidental physical injury to tangible property,"

9   *see Big Const., Inc.*, 2012 WL 1858723, at *7, and, therefore, potentially covered by the

10   CGL Policy (*see* CGL Policy at 6 (Insuring Agreement)).

11         Moreover, WSHH provides summaries of the "actual damages" it allegedly

12   incurred as a result of the delayed opening and associated loss of use of the Project.  (*See*

13   Resp. at 14 n.56 (citing Clapham Decl. ¶ 13, Ex. 11 ("Lust Decl.")); Lust Decl. ¶¶ 1-2

14   (attaching exhibits that summarize the "costs" and "actual damages incurred by WSHH

15   as a result of the 459-day delay to completion of the Project").)  The CGL Policy covers

16   property damage, including certain loss of use damages.  (*See* CGL Policy at 24.)  Thus,

17   WSHH's loss of use damages are also potentially covered by the CGL Policy.

18         Plaintiffs argue that WSHH's damages are, in reality, caused by Vandervert's

19   breach of the Contract or the "faulty workmanship" of Vandervert and its subcontractors,

20   neither of which are "accidents" and, thus, not a covered loss under the CGL Policy.  (*See*

21   Mot. at 11-12 (first citing *W. Nat. Assur. Co. v. Shelcon Const. Grp. LLC*, 332 P.3d 986,

22   989 (Wash. Ct. App. 2014); and then citing *Big Constr.*, 2012 WL 1858723, at *7).)

1    However, those arguments are better addressed by consideration of the CGL Policy's

2    exclusions, which the court turns to now.

3        4.    Applicability of Policy Exclusions

4        Even if WSHH's alleged losses "fall[] within the scope of the coverage," the court

5    must nevertheless "determine[] if policy exclusions bar coverage." *Big Const., Inc.*, 2012

6    WL 1858723, at *6.  Plaintiffs assert that four exclusions apply to bar coverage for

7    WSHH's losses:  Exclusion (b) (the "Contractual Liability Exclusion") (Mot. at 20-22);

8    Exclusion (j)(5) (the "Ongoing Operations Exclusion") (*id.* at 13-17); Exclusion (j)(6)

9    (the "Defective Work Exclusion") (*id.* at 17-18); and Exclusion (m) (the "Loss of Use

10   Exclusion") (*id.* at 18-20).  Each exclusion is considered below.

11       a.    *The Contractual Liability Exclusion*

12       Plaintiffs argue that WSHH's losses arise purely from Vandervert's breach of the

13   Contract and are barred by the Contractual Liability Exclusion, which provides, in

14   relevant part, that coverage is unavailable for "property damage for which the Insured is

15   obligated to pay damages" pursuant to "a contract or agreement," unless the insured

16   would be liable even "in the absence of the contract or agreement."  (CGL Policy at 7.)

17   WSHH does not dispute that it cannot recover for Vandervert's contractual liabilities.

18   (*See* Resp. at 15-16.)  Instead, it argues that at least part of its losses stem from

19   Vandervert's negligent supervision of Project subcontractors, which are losses that exist

20   irrespective of the Contract, and, accordingly, are not barred by the Contractual Liability

21   Exclusion.  (*Id.*)  This argument fails.

22   //

1    Because Vandervert entered receivership on February 2, 2018 (Todaro Decl.,

2    Ex. 18), WSHH was required to file any claims it held against Vandervert in that

3    proceeding or risk having them "barred from participating in any distribution to creditors

4    in any general receivership." *See* RCW 7.60.210(1).  By the same token, the only claims

5    for which Vandervert could have faced liability were those filed in the receivership

6    proceeding.  *Id.*  It is undisputed that the Claim WSHH submitted to the Receiver

7    described only breach of contract damages; it made no mention of losses arising from a

8    negligent supervision cause of action.  (*See generally* Claim.)  Because Vandervert's

9    liability to WSHH was solely for damages related to its alleged breach of the Contract,

10   there have never been any extra-contractual liabilities that Vandervert, as the insured,

11   "would have [faced] in the absence of the contract or agreement."  (*See* CGL Policy at 7.)

12   Accordingly, the Contractual Liability Exclusion applies and bars coverage for WSHH's

13   asserted losses.[7]

14    WSHH asserts that the Claim did "not purport to set forth the basis of each of [its]

15   claims against Vandervert," and suggests—without citation to supporting case law—that

16   it may seek coverage for any other claims it has against Vandervert.  (*See* Resp. at 15.)

17   Even if that argument is correct, Plaintiffs point to other exclusions that they contend

18   would independently bar coverage for WSHH's alleged losses.  The court turns to

19   consider those exclusions now.

20   *//*

21

22    [7] Because the court finds that the Contractual Liability Exclusion applies it does not
     consider Plaintiffs' argument that any negligent supervision claim WSHH might raise is time
     barred.  (*See* Mot. at 23.)

1     **b.**  *The Ongoing Operations Exclusion*

2    Plaintiffs also contend that coverage for WSHH's losses is barred by the Ongoing

3 Operations Exclusion, which precludes coverage for damage to property "on which [the

4 insured] or any contractors or subcontractors working directly or indirectly on your

5 behalf are performing operations, if the property damage arises out of those operations."

6 (CGL Policy at 10.)  WSHH argues that Plaintiffs' reliance on this exclusion "is

7 misplaced" for four reasons:  (1) "[t]he water intrusions occurred long after PWCI had

8 abandoned the Project in July 2016"; (2) Vandervert was not "performing any operations

9 that caused the . . . water intrusions"; (3) roof operations were completed at the time of

10 the water intrusion; and (4) at least some of the losses WSHH suffered occurred after

11 Vandervert left the Project.  (Resp. at 17-18.)  None of these arguments is persuasive.

12    The Ongoing Operations Exclusion applies whenever the insured, "or any

13 contractors or subcontractors working directly or indirectly on [the insured's] behalf are

14 performing operations."  (CGL Policy at 10.)  It is undisputed that Vandervert replaced

15 PWCI with JC's General Construction Co. on July 22, 2016 (Todaro Decl., Ex. 11) and

16 that work continued on the Project thereafter, including on the roof (*see, e.g.*, Todaro

17 Decl., Ex. 23 (daily logs documenting ongoing work on Project in October 2016)).  Thus,

18 neither PWCI's departure nor the fact that Vandervert did not directly perform the faulty

19 work that resulted in water damage precludes application of the Ongoing Operations

20 Exclusion.  (*See* CGL Policy at 10.)

21    Nor could a reasonable fact finder conclude that the Project's roof operations were

22 complete at the time of the flooding.  Indeed, despite evidence that a "watertight vapor

1   barrier roofing membrane" had been installed on the roof in August 2016, it is undisputed

2   that aspects of the roofing system "remained to be installed."  (*See* Todaro Decl., Ex. 13

3   at 2.)  And daily log notes from October 13 and 14, 2016—i.e., the days preceding the

4   initial flooding incident—observed that the roof was "still not dried in" such that "getting

5   the insulation wet [wa]s a concern."  (*See* Todaro Decl., Ex. 23 at 1-2; *see also* Todaro

6   Decl., Ex. 15 at WEST001013 ("Vandervert reported that for several months and up until

7   the week of November 28, 2016, the roof was not fully sealed during construction and

8   rainwater entered the building.").)

9          Finally, the fact that WSHH's loss of use post-dated Vandervert's termination on

10  February 1, 2018 does not mean that its losses "occurred after Vandervert left the

11  project."  (*See* Resp. at 17.)  To the contrary, the CGL Policy mandates that any "loss of

12  use" is "deemed to occur at the time of the physical injury that caused it."  (CGL Policy

13  at 24.)  The only physical injury at issue in this matter is the flooding that occurred, at the

14  latest, in December 2016.  (*See* Reasonableness Mot. at 5-6.)  It is undisputed that

15  Vandervert remained the general contractor on the Project at the time.  (*See* Todaro Decl.,

16  Ex. 16 (Vandervert termination letter).)

17         Because WSHH's losses stem from property damage that occurred during the

18  ongoing operations of its general contractor, Vandervert, the Ongoing Operations

19  Exclusion applies to bar coverage under the CGL Policy.  (*See* CGL Policy at 10.)

20                     c.      *The Defective Work Exclusion*

21         Plaintiffs argue that coverage for WSHH's Claim is additionally barred by the

22  Defective Work Exclusion, which excludes coverage under the CGL Policy for damage

1    to property "that must be restored, repaired or replaced because [the contractor's or

2    subcontractor's] work was incorrectly performed on it." (CGL Policy at 10.) WSHH

3    claims that an exception to the Defective Work Exclusion—the products-completed

4    operations hazard (CGL Policy at 23)—applies either because the damage for which

5    WSHH seeks coverage occurred to other completed work (*e.g.*, the HVAC and electrical

6    systems), or because the repairs for which WSHH seeks coverage occurred after

7    Vandervert was terminated. (Resp. at 18-19.)

8           The products-completed operations hazard provides an exception to the Defective

9    Work Exclusion where the at-issue property damage did not occur on premises owned or

10   rented by the insured and was caused by the insured's work. (CGL Policy at 23.) As the

11   name suggests, this exception to the Defective Work Exclusion does not apply where the

12   injury-causing work "has not yet been completed." (*Id.*) WSHH's arguments are thus

13   unavailing. Indeed, WSHH's focus on the fact that the HVAC and electrical systems

14   were completed when they suffered water damage misses the point. (*See* Resp. at 18.)

15   The products-completed operations hazard is concerned with the status of the work that

16   ***causes damage*** (the roof), and not the work that ***suffers damage*** (the HVAC and

17   electrical systems). (*See* CGL Policy at 23.) It is undisputed that WSHH's losses derive

18   from the incomplete roof and the flooding that resulted.

19          Nor does the fact that WSHH elected to repair the water damage after terminating

20   Vandervert in February 2018 mean that the property damage occurred after Vandervert's

21   operations were completed. (*See* Resp. at 19.) Again, the flooding that made those

22   repairs necessary indisputably occurred in October and December 2016

1   (*see* Reasonableness Mot. at 5-6), when the roof had yet to be "dried in" (*see* Todaro

2   Decl., Ex. 23 at 1-2).  Vandervert's work on the Project was ongoing at that point.  (*See*

3   Todaro Decl., Ex. 16.)

4         Because the property damage that caused WSHH's losses was caused by work that

5   was incomplete, the products-completed operations hazard exception does not apply, the

6   Defective Work Exclusion does apply, and coverage for WSHH's claimed losses is

7   additionally barred by that exclusion.

8                       *d.*       *The Loss of Use Exclusion*

9         Plaintiffs also assert that the Loss of Use Exclusion bars the loss of use damages

10  WSHH's claims.  (CGL Policy at 11.)  The Loss of Use Exclusion applies "to claims

11  arising out of the loss of use of tangible property, which has not been physically injured,

12  resulting from either the insured's delayed performance of a contract, or an insured's

13  faulty performance of that contract."  *Hayden v. Mut. of Enumclaw Ins. Co.*, 1 P.3d 1167,

14  1172 (Wash. 2000); (*see also* CGL Policy at 11).

15        That is precisely the situation here.  WSHH seeks to recover loss of use damages

16  for costs incurred during the period in which it expected to be able to use its hotel, but

17  was unable to do so because Vandervert failed to deliver the Project on time because of

18  the substandard subcontractor work and resulting water damage.  (*See* Lust Decl. ¶¶ 1-2;

19  *see also* Reasonableness Mot at 21 (asserting that "[t]he 459-day delay to substantial

20  completion, caused WSHH to incur . . . loss of use damages").)  WSHH's effort to

21  shoehorn its loss of use damages into an exception to the definition for "impaired

22  property" is unavailing.  (*See* Resp. at 19-20 (citing CGL Policy at 21).)  As stated above,

1    WSHH's loss of use damages fit naturally within the CGL Policy's exclusion for "claims

2    arising out of the loss of use of tangible property, which has not been physically injured,

3    resulting from either the insured's delayed performance of a contract, or an insured's

4    faulty performance of that contract." *Hayden*, 1 P.3d at 1172; (CGL Policy at 11).

5    WSHH provides no reason for the court to adopt its strained application of that exclusion

6    and the court declines to do so. *See Queen City Farms, Inc. v. Cent. Nat. Ins. Co. of*

7    *Omaha*, 882 P.2d 703, 718 (Wash. 1994) (noting that policy exclusions are to be

8    "interpreted in accord with the understanding of the average purchaser of insurance, and

9    the terms are to be given their plain, ordinary and popular meaning").

10          Accordingly, the Loss of Use Exclusion applies and precludes coverage under the

11   CGL Policy for WSHH's loss of use damages.

12          5.      Coverage Under the Umbrella Policy

13          As a fallback position, WSHH argues that, even if coverage is unavailable under

14   the CGL Policy, it is available under the Umbrella Policy because Plaintiffs waived their

15   right to deny coverage by reserving their rights only as to the CGL Policy. (*See* Resp. at

16   7, 13.) This argument fails as a matter of fact and law. Factually, the reservation of

17   rights letter purports to apply to both the CGL Policy and Umbrella Policy. (*See*

18   Reservation Letter at 1 (identifying both policies in the header).) And legally, the failure

19   to reserve its rights would not mean that Plaintiffs are now obligated to provide coverage

20   under that policy. The Umbrella Policy covers only "those sums in excess of" the

21   coverage provided by superseding policies, like the CGL Policy. (*See* Umbrella Policy at

22   //

ORDER - 23

12.[8])  Because the court finds that the CGL Policy excludes coverage for WSHH's losses, there is no excess to which the Umbrella Policy's coverage could apply.

### IV.  CONCLUSION

For the reasons given above, the court the court DENIES WSHH's motion for a continuance under Federal Rule of Civil Procedure 56(d) (Dkt. # 19) and GRANTS Plaintiffs' motion for summary judgment (Dkt. # 15).

Dated this 4th day of February, 2022.

JAMES L. ROBART
United States District Judge

---

[8] The court uses the page numbers appearing in the CM/ECF header when citing to the Umbrella Policy.

ORDER - 24